**GREAT NORTHERN RY. CO. v. MELTON.**
No. 12903.

United States Court of Appeals
Ninth Circuit.

Dec. 26, 1951.

T. B. Weir, E. K. Matson, Newell Gough, Jr., Helena, Mont., for appellant.

Leonard A. Schulz, Dillon, Mont., H. L. Maury, A. G. Shone, Butte, Mont., for appellee.

Before HEALY and POPE, Circuit Judges, and LEMMON, District Judge.

POPE, Circuit Judge.

This is an appeal from a judgment for appellee on account of damage to sheep which appellee shipped over appellant's railroad from Kevin, Montana, to Wickes, in the same State, the shipment taking place entirely within Montana. Jurisdiction arose out of diversity of citizenship of the parties.

The court found that the appellee's sheep, consisting of ewes, lambs, and bucks, were delivered to the Railway Company, and loaded on its cars, in sound, healthy and good condition; that the shipment was not accompanied by appellee or any agent of appellee, and that before arrival at destina-

tion the sheep "became bruised, injured, trampled, suffocated and said sheep lost the scent of each other, resulting in ewes and lambs being unable to identify their own, and as a direct result" some died and others became sick.

The Montana law with respect to the liability of a carrier, such as the appellant here, is stated in § 8–812, Revised Codes of Montana, 1947, as follows: "Liability of inland carriers for loss. Unless the consignor accompanies the freight and retains exclusive control thereof, an inland common carrier of property is liable, from the time that he accepts until he relieves himself from liability, pursuant to sections 8–414 to 8–417, for the loss or injury thereof from any cause whatever, except: 1. An inherent defect, vice, weakness, or a spontaneous action of the property itself; 2. The act of a public enemy of the United States, or of this state; 3. The act of the law; or, 4. An irresistible superhuman cause."

§ 8–707 of the same statutes provides: "Obligations of carrier altered only by agreement. The obligations of a common carrier cannot be limited by general notice on his part, but may be limited by special contract".

The court found that the parties here entered into a written agreement for the transportation of these sheep, designated a "Uniform Livestock Contract" purportedly constituting a special contract limiting the

liability imposed by § 8–812, quoted above. The portions thereof set out in the findings are copied in the margin.[1] The significant language here is that which excepts the carrier from liability caused by "heat or cold, changes in weather," etc.

Appellant sought to avoid its liability under § 8–812 "for the loss or injury thereof" by undertaking to prove affirmatively (a) that the loss was caused by an "inherent defect, vice, weakness, or a spontaneous action" of the sheep, and hence excepted under the statute, and (b) that it was due to an act of God, "the inherent vice, weakness or natural propensity of the animal * * * overloading, crowding one upon another * * * heat or cold" and "changes in weather", and hence excepted under the special contract.[2]

The evidence shows, and the court found, that when the sheep reached destination, the floors of the cars were wet and slippery, the sheep were covered with dirt, and were "all jammed up" in the north end of each car. Some were then dead, others died shortly thereafter, in consequence of their injuries from piling and trampling, and many of the lambs became "bums" because in their wet, muddy condition the lambs and ewes lost the sense of smell which was their only means of recognizing each other, and the disowned lambs never attained normal growth.

The court found that the damage was not

1. "Sec. 1(a). Except in the case of its negligence proximately contributing thereto, no carrier or party in possession of all or any of the livestock herein described shall be liable, for any loss thereof or damage thereto or delay caused by the Act of God, the public enemy, quarantine, the authority of law, the inherent vice, weakness, or natural propensity of the animal, or the act or default of the shipper or owner, or the agent of either, or by riots, strikes, stoppage of labor or threatened violence.

"(b) Unless caused by the negligence of the carrier or its employees, no carrier shall be liable for or on account of any injury or death sustained by said livestock occasioned by any of the following causes: Overloading, crowding one upon another, escaping from cars, pens or vessels, kicking or goring or otherwise injuring themselves or each other, suffo-

cation, fright, or fire caused by the shipper or the shipper's agent, heat or cold, changes in weather or delay caused by stress of weather or damage to or obstruction of track or other causes beyond the carrier's control."

"Sec. 4(a). The shipper at his own risk and expense shall load and unload the livestock into and out of cars, except in those instances where this duty is made obligatory upon the carrier by statute, or is assumed by a lawful tariff provision."

2. The company also asserted that the injuries were caused by plaintiff's negligence in loading the sheep when they were wet, and overcrowding them in the cars. There was no evidence of overloading and the court's finding that when delivered and loaded "said livestock was in good condition" necessarily excludes any such negligence on appellee's part.

due to any of the causes excepted by the statute, § 8–812.[3] The evidence is unquestionably sufficient to support this finding.[4] There was no corresponding finding expressly negativing the existence of the causes of loss excepted in the contract. More particularly, there was no finding that the injuries were not caused by "changes in weather".

On the other hand, while the court coupled the existence of that condition with a finding of negligence, it did determine that a change in weather was the primary cause of the injury to the sheep. The court found: "that after loading said sheep at Kevin, Montana, and during the course of transportation to Wickes, Montana, said shipment of sheep were again rained upon and as a result thereof became wet and saturated with moisture; that the cars in which they were being so transported also became wet and muddy, causing the said sheep to become covered with dirt, manure and other foreign matter; that as a proximate result of being rained on and becoming covered with dirt and other foreign matter, and being transported in a car, the floor of which was wet and slippery, said sheep became bruised, injured, trampled, suffocated," etc.

■ Assuming the validity of the contract, the appellant would not be relieved of liability because "change of weather" caused the injuries, if its own negligence was a concurring cause.

■ The court found that appellant was negligent in accepting the sheep for carriage knowing that it might rain during the transportation.[5] We think this finding is insuf-

3. "That the damage to the sheep did not occur as a result of any inherent defect, vice, weakness or spontaneous action of the property itself, or of the act by public enemy of the United States or of this state, nor was the damage caused as a result of any act of the law or any irresistible superhuman cause; * * *."

4. There was evidence that the train was nearly five hours late leaving Great Falls, but that on the run to Wickes it made up more than three hours of the lost time. The last portion of the run was over a steep uphill grade. The sheep were all found piled up at the downhill end of the eight cars. Although all the conductors testified there was no rough handling, the court was not obliged to accept their testimony.

5. "V. That prior to the loading of said sheep at Kevin, Montana, on May 30, 1949, they had been subjected to rain which caused them to become wet; that they had been driven through mud to the loading pens; that it rained immediately prior to the loading of said sheep at Kevin, Montana; that plaintiff judged the said sheep had dried sufficiently that they could be safely loaded and transported to Wickes, Montana; that defendant accepted said sheep for carriage over its line as being in apparent good shape and fit to travel over said line to Wickes, Montana; that defendant knew said shipment of sheep had been rained upon and were wet when it accepted them; that defendant had weather information available to it and knew, or could have known

in the exercise of reasonable care, that more rain and wet conditions were to be expected; that after loading said sheep at Kevin, Montana, and during the course of transportation to Wickes, Montana, said shipment of sheep were again rained upon and as a result thereof became wet and saturated with moisture; that the cars in which they were being so transported also became wet and muddy, causing the said sheep to become covered with dirt, manure and other foreign matter; that as a proximate result of being rained on and becoming covered with dirt and other foreign matter, and being transported in a car, the floor of which was wet and slippery, said sheep became bruised, injured, trampled, suffocated and said sheep lost the scent of each other, resulting in ewes and lambs being unable to identify their own, and as a direct result 58 of said ewes died, 149 of said lambs died, 170 of said ewes were rendered sick and two of said bucks were killed; that because of the slippery condition of the floors of said railroad cars upon arrival at Wickes, Montana, said sheep were all jammed up in the north end of each and every railroad car.

"VI. It is further found that defendant was negligent in accepting for carriage, and in transporting to Wickes, Montana, the said shipment of sheep when it knew, or in the exercise of reasonable care should have known, that it might rain on said sheep during the course of transportation to Wickes, Montana, and that damage to said sheep as a result of such additional rain would occur; * * *."

ficient to charge the appellant with negligence which was the efficient cause of the damage. It is apparent from the finding, which accurately reflects the evidence, that it was the appellee, Melton, who decided when the sheep were to be loaded and shipped. A sheep man of long experience, he proceeded to load them when he "judged the said sheep had dried sufficiently". At the trial it was proven what the weather actually was, but there was no evidence of any weather forecast. It was not shown that the company had any more, or better information as to the likelihood of rain, than had Melton. At that time of the year, (May 30), both parties might reasonably anticipate more rain. Under the circumstances here, once Melton decided to load, the company could not be charged with responsibility for the loss here described merely because it accepted the shipment.[6]

The court made one additional finding of negligence: "That defendant was negligent in not properly caring for said sheep or properly inspecting said sheep to determine their condition after they were rained upon during the course of transportation." The court did not find at what stage in the transportation, or when, after the sheep were rained upon, the failure to care for them occurred.[7] There is no finding that notwithstanding the sheep were rained on, and hence wet and muddy, the loss would not have occurred had there been proper care or inspection. There is no other finding of negligence, either general or particular.

In this situation, with the injuries attributed solely to (a) the rain and (b) negligent failure to provide care or inspection, this court is in no position to ascertain or conclude what portion of the losses are attributable to the latter cause.

▬ The trial court found it unnecessary to consider the impact of the clause of the contract excepting injuries caused by "changes in weather", not only because, as we have pointed out, it charged the fact that the sheep were rained upon to the company's negligence, but also it held the contract invalid and "not binding upon the plaintiff for the reason that there is no consideration for such a special contract".

The sheep were, for the convenience of appellee, shipped on two bills of lading, or, as they were called, "Uniform Livestock Contracts". They were signed by or on behalf of the shipper, and plaintiff-appellee offered them in evidence as a part of his case, and relied heavily upon their recital: "Livestock described below in apparent good order". It does not appear from the record that the validity of the special contract was questioned prior to the court's findings.

The court found that the $600 freight paid "was the ordinary and usual rate for such a shipment". The complaint alleged, and the answer admitted, that the charges were those "usually charged by the defendant". There is no evidence as to whether the company had one tariff for shipments with, and another for shipments without, the special contract. Both parties assume, as do we, that all such livestock shipments within the state were made upon similar contracts.

Under these circumstances we cannot perceive that there was any want of consideration for the contract as written. The statute of the State permits such a limitation of obligations, which, although not allowed through "general notice" may be accomplished "by special contract". § 8–707, R.C.M.1947, quoted supra. In substance, what happened was that the company agreed, for the $600 paid, to haul the freight on the terms stated. Each contract signed was a single contract,—the stated obligations and promises on one side were the consideration for those on the other. As stated by the Montana Supreme Court in

---

6. See § 8–702, R.C.M.1947: "Obligation to accept freight. A common carrier must, if able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry."

7. The evidence showed that after the arrival at Wickes, the conductor set the sheep cars on a side track, and proceeded with his train to Butte, over the protests of Melton who called attention to the bad condition of the sheep and asked for their immediate unloading. The sheep could not be unloaded until the arrival of a northbound local train an hour or an hour and a half later.

Rose v. Northern Pacific Railway Co., 35 Mont. 70, 88 P. 767, 768: "It is not necessary that there should have been a special or independent consideration for every separate paragraph or provision of the contract, for the consideration of the contract itself is a consideration for every provision in it."

Appellee asserts the court's conclusion was right because to find consideration it must appear that the carriage, with the contract limitations on liability, was upon a "reduced rate", and that in the absence of two established rates, one with, and one without the limitations, from which the shipper might choose, the rate cannot be said to a "reduced" one.

We assume, as both parties do, that all such shipments were made upon this same bill of lading, and that the rate here paid was the only established one. We perceive nothing to negative the natural assumption that the $600 charge was the established rate to be paid for shipment with the provisions in the contract limiting the liability of the company.

In Cau v. Texas, etc. Ry. Company, 194 U.S. 427, 431, 24 S.Ct. 663, 664, 48 L.Ed. 1053, said: "In other words, the consideration expressed in the bill of lading was sufficient to support its stipulations. This effect is not averted by showing that the defendant had only one rate. It was the rate also of all other roads, and presumably it was adopted and offered to shippers in view of the limitation of the common-law liability of the roads."[8]

We note the Montana statute: "A written instrument is presumptive evidence of a consideration." § 13–510, R.C.M.1947. And § 13–511 provides: "The burden of showing a want of consideration sufficient to support an instrument lies with the party seeking to invalidate or avoid it."

And if, as the parties assume, this "Uniform Livestock Contract" form was invariably used, it may be inferred that the officially approved tariff contemplated shipments under its terms.[9]

■ Concluding as we do, that the provisions of the special contract were valid, we are confronted with findings that the loss was caused by (a) the coming of the rain during the transportation, and (b) the company's negligence in not properly caring for or properly inspecting the sheep to determine their condition "after they were rained upon". For the reasons heretofore stated, we think liability cannot be predicated upon cause (a). We have noted the absence of a finding that cause (b) was alone sufficient to account for the loss. There is no determination as to what portion of the loss must be attributed to this latter cause.[10] These are determinations

8. In Rose v. Northern Pacific Railway Co., supra, the Montana court followed the Cau case and quoted from it the following: "But it is urged that the contract must be upon a consideration other than the mere transportation of the property, and an 'option and opportunity must be given to the shipper to select under which (the common-law or limited liability) he will ship his goods.' If this means that a carrier must take no advantage of the shipper or practice no deceit upon him, we agree. If it means that the alternative must be actually presented to the shipper by the carrier, we cannot agree. From the standpoint of the law the relation between carrier and shipper is simple. Primarily the carrier's responsibility is that expressed in the common law, and the shipper must insist upon the responsibility. But he may consent to a limitation of it, and this is the 'option and opportunity' which is offered to him."

9. Railroad rates in Montana are established by the State Board of Railroad Commissioners. § 72–116, R.C.M. 1947, Montana, etc. Co. v. Great Northern Ry. Co., 91 Mont. 194, 203, 7 P.2d 919.

10. If, as the court found, the sheep started the journey in good condition, but reached Wickes "all jammed up" in the north end of each car, it could well be that this piling up began at some earlier point in the journey. The trainmen successively in charge of the shipment testified they inspected the train at six different points upon the trip and upon arrival at Wickes. None of them noted anything wrong with the sheep. No doubt the court considered that their failure to see what should have been apparent demonstrated failure to use care to make inspections. We cannot say whether careful inspections, followed by reasonable attention to the sheep the moment their distress became apparent, would have avoided the loss.

which we, as an appellate court, are not permitted to make in a case of this kind.[11]

We think the cause must be remanded for further findings in the light of what we have here concluded. We assume that if the court shall be of the view that the loss was due to a cause within the exceptions stated in the special contract, it will make an express finding to that effect. If it finds otherwise, it need only add to its findings of receipt of the sheep in good condition and their arrival in the damaged condition a finding that the loss was not due to any of the excepted causes listed either in the statute, or in the contract.

Reversed and remanded.

11. Our difficulty stems from the finding that the coming of the rain was a cause of the condition of the sheep, a cause within the term "changes in weather", in the contract. It is not for us to say either that this was the efficient cause of the loss, because any neglect of care or inspection occurred after the damage was done, or that it was not an efficient cause because the consequences would not have been suffered, notwithstanding the rain, were it not for rough handling of the train, or failure of proper care and inspection at a time when the loss might have been avoided.